NO. 07-08-0459-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

SEPTEMBER 11, 2009
_____

MITCHELL E. WACHHOLTZ,

Appellant

v.

THE STATE OF TEXAS,

Appellee
_____

FROM THE 364TH DISTRICT COURT OF LUBBOCK COUNTY;

NO.  2007-416,930; HON. BRAD UNDERWOOD, PRESIDING
_____

***Opinion***
_____

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

Mitchell E. Wachholtz (appellant) appeals his conviction for murder.  Through four issues, he contends that the trial court erred by 1) excluding evidence regarding the presence of drugs in the vehicle from which the victim exited and gang affiliation and 2) admitting evidence of his statement that he planned to rob banks and "go out in a blaze" or something of that ilk.  We affirm.

### *Background*

The event began with appellant, a convicted felon, taking methamphetamine earlier in the day before the shooting. While allegedly coming down from his high, he and Brady Herzog drove to a local convenience store to buy gasoline around 1:30 a.m. Two young Hispanics were inside and standing at the checkout line. Three African-Americans (Chase Pendleton, Marcus Smith and Smith's friend) were also present when appellant and Herzog entered the store to pay for the gas, approached the cash register and assumed a place behind the two Hispanics.

Though Pendleton stood quietly by the store's entrance, Smith was not of like deportment. He admitted to being drunk and acting like a "jerk." Moreover, he spoke out loudly and repeatedly interjected the word "nigger" in his speech.[1] So too did he proclaim that there had better be no one waiting to check out when he walked up to the cashier. Other testimony revealed that someone from the group other than Pendleton commented aloud about how the two Hispanics were dressed and how they were attempting to appear "white." It was at this time Smith approached the cashier, bumped or "shouldered" either appellant or Herzog, and cut to the front of the line. Witnessing this, appellant left the store purportedly to avoid conflict, went to his van, realized Herzog was still in the store, decided to return and retrieve Herzog, collected a .25 caliber handgun, and walked towards the store's entrance.

Despite Smith's antics, neither Herzog, the two Hispanic males nor the cashier feared for their safety. The cashier knew Smith, and the others in line simply ignored him.

---

[1]Apparently, Smith and Pendleton were African-American. Appellant and Herzog were Anglo-American.

Furthermore, no one saw Smith or his friends carrying any type of weapon. And, though he cut in front of the two Hispanics, Smith either offered to pay or paid for the items the Hispanics intended to buy.

Having finished their business, Pendleton, Smith, and the third member of the party turned to leave the store. They walked out the door and encountered appellant, who raised the handgun and began firing.[2]

Pendleton was mortally wounded. Smith also was hit, but his wound was minor. And as those left in the store dropped to the ground when the shots rang out, Smith and his friend ran back through the establishment and left the scene.

Pendleton lay on the ground dying as his brother exited a vehicle parked outside the store and attempted to apprehend appellant. The effort was unsuccessful. And, as appellant readied his vehicle to leave, Herzog returned, entered it and asked appellant what he "was thinking" when he began shooting. Appellant replied by suggesting that the three individuals whom he shot at may or should have "learned their lesson." Later he was overheard alluding to there being "one dead wabbit" after watching a news broadcast of the shooting and Pendleton's death.

At trial, appellant claimed that he had acted in self-defense. In describing why he did so, he mentioned that he "feared for his life" and could not "retreat" prior to shooting. And though he professed concern over the incident, he nonetheless attended a concert in

_____

[2]Appellant testified that he was five feet from the door when he met the three leaving. One of them purportedly went to his right, one went left. Pendleton appeared before him and supposedly made some gesture. Its nature, however, went unexplained. This is so because appellant performed the gesture for the jury; he did not verbally describe it. So, it was not memorialized in the appellate record, and we have no way of assessing its potential, if any, for instilling fear in others. That written trial transcripts normally capture words as opposed to conduct is something that litigants should remember at trial. Nevertheless, no other witness mentioned seeing Pendleton's gesture towards appellant as the group left.

3

another town the next day.  Given its verdict, the jury obviously did not believe appellant acted in self-defense.

### Issues One and Two - Excluded Evidence

In his first two issues, appellant contends that the trial court erred in excluding evidence about drugs being found in the car from which Pendleton's brother alighted and about his brother's alleged gang affiliation.  We overrule the issues.

*Standard of Review*

The standard of review when considering issues like that at bar is one of abused discretion.  *Walters v. State,* 247 S.W.3d 204, 217 (Tex. Crim. App. 2007).  Implicit therein is the truism that trial courts are free to exercise discretion when deciding whether to admit or exclude evidence.  Admittedly, that discretion is not unbridled for the decision must comport with the law as applied to the circumstances before the court. Yet, circumstances differ from case to case.  And, laws are often drafted to address concepts as opposed to specific situations.  This is no less true when the law involved consists of rules of evidence. So, the trial judge is regularly called upon to use his judicial acumen and experience in deciding how and when a particular rule applies to a developing situation.  And, that task can be quite daunting since the result may depend upon how a jurist views or interprets those unfolding circumstances.

As illustrated by the rather common optical illusion of the beauty and the hag, whether one perceives the beauty or the hag is influenced by the indicia upon which he

focuses.[3]  For some reason certain viewers are initially drawn to the lines depicting the beauty while others see those presenting the hag.  Neither vision is inaccurate, however, for both lay within the illusion.  The same can be said of many controversies that arise before a trial judge and the resolution of which lies in the exercise of his discretion.  The indicia a particular judge may focus upon may in fact lead to different, yet equally correct, results.  And, so long as the picture before them allows for either vision or result, neither is wrong.  That is the seed underlying the concept of abused discretion for the result need only fall within the zone of reasonable debate given the indicia or circumstances before the court and the manner in which the court perceives them.  *Walters v. State*, 247 S.W.3d at 217 (holding that a trial court abuses its discretion when its decision falls outside the zone of reasonable disagreement).  And, unless the result falls outside that zone of disagreement, we cannot change it.

*Application of Standard*

As previously mentioned, appellant sought permission to disclose the drugs found in the car and the significance of various tattoos on the body of Pendleton's brother.  That evidence, according to appellant, would help illustrate the context of the shooting and help

---

[3]



5

explain why he shot, *i.e.* why he allegedly felt threatened. Yet, we are cited to no evidence of record suggesting that appellant knew who was in the car, knew that one of the occupants bore tattoos signifying gang involvement, or that he even saw anyone wearing tattoos indicative of some gang affiliation. Nor did our review of the record uncover such evidence. Without such evidence and since one's perception and interpretation of the circumstances before him are at the heart of a self-defense claim, it is difficult to see any nexus between the tattoos and the stimuli motivating appellant's conduct. So, a jurist could reasonably conclude that visual minutia that went unperceived by an actor, such as appellant, has little relevance to why the actor did what he did. Because of that, we cannot say that the decision to exclude allusion to the tattoos at bar fell outside the zone of reasonable disagreement.

Nor can we say that the trial court's decision to exclude reference to the drugs evinced an instance of abused discretion. While appellant or others may have perceived some of those present as being "high," Smith admitted to being drunk, boisterous, and acting obnoxiously. More importantly, this acknowledgment corroborated the perception of someone being "high," which perception constituted an indicia allegedly influencing appellant's own conduct. That appellant thought the substance influencing the behavior was a particular drug, that a particular drug would cause conduct different than that caused by alcohol, and that he thought one's propensity for violence could differ based upon the particular substance ingested is nowhere mentioned by appellant. Nor are we cited to evidence suggesting that Pendleton, the ultimate decedent, had ingested illegal substances. So, under these circumstances, we cannot say that the decision to exclude evidence of the particular substance influencing Smith's behavior, or that of anyone else,

6

was of import.  At the very least, the matter was reasonably debatable, and because it was, we cannot say that the decision of the trial court fell outside the zone of reasonable disagreement.

### *Issues Three and Four*

In issues three and four, appellant contends that the trial court abused its discretion when admitting evidence of a statement made by appellant concerning his intent to rob banks and go out in a blaze.  We overrule these issues as well.

At trial, the State argued that appellant had made statements to the effect that he (appellant) was "going to rob a bunch of banks and put them [sic] in a bank account, and he was going to go out blazing."  Appellant objected, believing the matter to be irrelevant and inadmissible.  Nonetheless, the trial court admitted it as evidence of flight or consciousness of guilt.  No other objections were made at the time.  Subsequently, Connie Pemlot Smith, a friend of appellant's, testified.  The State asked her about any plans appellant had after attending the concert in Amarillo.  Appellant again complained and secured a running objection to the testimony.  Connie then testified that appellant told her he was "going to rob a bunch of banks and put money in an account for Brady [Herzog]."  The State then asked her if she thought the statement showed his intent to leave town and she thought that was what he meant.

Evidence of flight may be admissible to show a consciousness of guilt.  *Bigby v. State*, 892 S.W.2d 864, 883 (Tex. Crim. App. 1994).  Yet, whether the comment in question was of that ilk is not something we need to address.  Instead, we assume

7

*arguendo* that appellant was right and conclude that the admission of the statement was harmless.

That appellant shot and killed Pendleton was uncontested. Thus, the principal issue before the jury revolved around whether the killing could be justified. The record contains a plethora of evidence illustrating that it was not. That evidence included appellant's own comments about a dead "wabbit" and teaching the victims a lesson, his attending a concert after the shooting, and the testimony that no one else experiencing the events that unfolded in the store feared for their safety prior to the shooting. Indeed, appellant's own passenger at the time of the shooting saw no threat even though he remained in the midst of the situation after appellant left the store. So too did that individual express incredulity at what appellant did and why he did it. To that we add the undisputed evidence that appellant was not only capable of retreating but actually retreated unharmed before deciding to return with a firearm. And, that appellant supposedly returned to help Herzog carries little importance since the defense submitted to the jury was not that of defending third parties but rather of defending himself. Also before the jury was appellant's status as a convicted felon illegally possessing a gun, appellant's prior assault upon an ex-wife, his tendency to abuse drugs, his having ingested methamphetamine before the shooting, his potential association with that of a nationally known motorcycle gang, his continuing to shoot after the purported aggressors fled, and his description of experiences garnered from his prison life. That appellant used such legal buzzwords as "retreat" and "fear for my safety" in describing the event and his emotions could have also been seen by the jury as rehearsed and less than sincere.

8

In short, the trial was a clean one.  And aside from the comment at issue, there was so much more in the record that could, and undoubtedly did, legitimately negate the premise that appellant acted out of self-defense.  Given this, we cannot but hold that any affect his braggadocio about robbing banks had on the jury was slight at best.  Thus, the last two issues provide no basis upon which to reverse the judgment.

Having overruled each issue, we affirm the judgment of the trial court.


Brian Quinn
Chief Justice

Publish.

9