**AFFIRM; and Opinion Filed August 1, 2018.**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-17-00658-CR

**SHUNDALE TAYLOR, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 204th Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F-16-75497-Q**

## MEMORANDUM OPINION

Before Justices Lang-Miers, Evans, and Schenck
Opinion by Justice Lang-Miers

Appellant Shundale Taylor[1] was convicted of murder and sentenced to twenty-six years'

imprisonment and a $5,000.00 fine. In three issues on appeal, appellant claims that (1) the trial

court erred by failing to grant her request for a jury instruction on the lesser included offense of

criminally negligent homicide, (2) the evidence was insufficient to sustain her conviction for

murder, and (3) the trial court erred by excluding evidence of the deceased's gang tattoos. We

affirm.

---

[1] Appellant was also known, and often referred to at trial, as "Tootie" and "Tootie Bee."

**Background**

On March 29, 2016, Antoine Hodge was shot once in the chest outside an apartment complex at 5880 Bernal in Dallas, Texas. Antoine, with his brother Chevis,[2] was at the complex to witness a fight between two women, Dajee Dillard[3] and Jelicia Linwood.[4] Antoine subsequently died of his wound. The ballistics expert testified the bullet that killed Antoine was fired from appellant's gun.

The fight between Dillard and Linwood was the culmination of a dispute that had been going on for months between the two women. Both women worked as exotic dancers at the Dallas Cabaret North Club. On February 12, 2016, Linwood had been suspended from the club for trying to fight Dillard. Their dispute carried over to social media, with numerous posts on Facebook.

On March 28, 2016, Dillard was working at the club when Linwood and appellant, who was Linwood's girlfriend and lover, arrived as paying customers. Dillard testified that Linwood and appellant harassed her during her performance:

> [T]hey were, like, at my stage. And they were like putting their foot on my stage and, like, throwing, like, ripped dollars, stuff like that, at my stage.
>
> *
> They were like throwing like ripped dollars on the stage and actually like putting their foot on the stage and stand up in front of the stage and like do like hand gestures towards me as if they wanted to fight.

Dillard thought this was disrespectful and complained to the management of the club, which did not take any action. Linwood and appellant eventually left the club around 3:00 – 3:30 a.m.

---

[2] Because both brothers have the surname Hodge, they will be referred to in this opinion by their first names.

[3] Dajee Dillard was sometimes known as "Treasure" or "Sugar." She was known on Facebook as "BenFrank."

[4] Jelicia Linwood was generally known, and often referred to at trial, as "Kaos." She was known on Facebook as "Kaos SavageAss."

When Dillard finished her shift in the early morning hours, she went to her sister's house to sleep. During this time, she was with Chevis, who was her daughter's father.

While Dillard slept, numerous posts were made on Facebook in an effort to get Dillard to fight Linwood. Dillard testified that she did not see these posts until roughly 5:00 p.m. when she woke up. Dillard agreed to fight Linwood one-on-one and posted that on Facebook.[5] The jury heard evidence that after Dillard agreed to the fight, appellant commented on Facebook: "Got to know I'm behind my bitch."

Dillard and Chevis left her sister's apartment and went to Antoine's residence. While Chevis went inside for a period of time, Dillard waited outside and corresponded with others on her phone. When Chevis and Antoine came out, they all drove to a Texaco in Dillard's vehicle where Dillard met up with her cousin, Renika Berwick, who wanted to watch the fight. Berwick was accompanied by Britney Collins. Two other women, who were in their own car, Kiara McKenzie and Nashay Rowe, also met Dillard at the Texaco station. Dillard got into Berwick's car and the women, in two cars, drove to meet Linwood at the apartment complex on Bernal. Chevis and Antoine drove off in Dillard's car; they did not tell Dillard where they were going.

Dillard testified that during this time period Linwood and appellant were "blowing up my phone" and essentially "hunting" her. They kept changing the location of the fight: first it was to be at the Texaco station, then at a bus stop, and finally at the apartment complex on Bernal. Linwood and appellant, who had posted on Facebook that they were "in the west," *i.e.,* west Dallas, supplied the address of the complex.

When Dillard arrived at the apartment complex, Chevis and Antoine were already there. There had been no plan to send the men to the complex but Dillard was not surprised to find them

---

[5] The Facebook posts started at 1:46 p.m. and continued until 7:14 p.m. when Dillard arrived at the apartment complex to fight Linwood.

there. Linwood and appellant were standing in a grassy area by an apartment door. Berwick heard appellant say "Nobody not gonna fuck with my bitch. Nobody not gonna fuck with my bitch." Collins was to video the fight on her phone.[6]

Dillard and Linwood "rushed together." Blows were exchanged and Linwood fell to the ground with Dillard on top of her. Appellant jumped into the fight and grabbed Dillard from behind. Dillard testified that appellant was hitting her in the head and trying to pull her off Linwood. Dillard recalled hearing a lot of commotion, but not exactly what was being said.

Within a few seconds of the start of the fight two shots were fired, both from appellant's gun. As noted above, Antoine died as a result of being hit in the chest by one of those bullets.

### Differing Accounts of the Shooting

The shooting itself was not recorded on the video. At trial, various different accounts were given of how the shooting occurred. The State's evidence of how the shooting occurred consisted of the testimony of Dillard, Berwick and Collins. The defense evidence of how the shooting occurred consisted of the testimony of Quan Javnae Vinson, Chevis, Nicholas Hearne, Linwood, and appellant.

#### Dillard's Testimony

Dillard testified that she heard a shot while Linwood had her on the ground. She got up and ran towards Berwick's car. She also recalled hearing a second shot, but did not remember if she heard that while she was still on the ground or while she was running. She testified that the shots were coming from appellant, though she did not see appellant with a gun in her hand. She saw Antoine lying on the ground on his stomach. Dillard tried to go to Antoine, but Berwick pulled her

---

[6] The video of the actual fight was very short because Collins dropped the phone. She was, however, able to identify everyone on the video and provided testimony as to who was shown and heard on the video.

into the car and drove off. Dillard testified that she did not see anyone else with a gun and did not hear any other guns being fired.

*Berwick's Testimony*

Berwick confirmed Dillard's testimony that once the fight began, appellant jumped in. Berwick stated that while the people watching the fight were starting to walk towards the fight, nobody touched appellant and nobody had a weapon. She did not hear either of the Hodge brothers threaten appellant or Linwood. Berwick testified that she saw appellant holding a gun and heard one shot from appellant's gun. It was only a matter of seconds between the time that appellant jumped into the fight before the first shot was fired. Berwick also testified that she saw appellant point the gun toward the street, which was the area where Antoine had been standing. As Berwick ran toward her car, she saw Antoine crawling on the ground; he said "Somebody help me, help me. I got hit." Berwick did not see any other guns at the complex.

*Collins' Testimony*

Collins testified that as soon as the fight started and Dillard got Linwood on the ground, appellant jumped in to try and break up the fight by trying to pull Dillard off Linwood. Collins stated that people were screaming "Let her work" *i.e.,* let the fight continue. Collins testified that Antoine can be heard on the video saying "move your bitch" and "B-word, do it," *i.e.*, "Bitch, do it." His clothes and shoes can be seen in the video. The first shot was fired at 15 seconds into the video and the second shot at 18 seconds into the video. The only weapon Collins saw was appellant's gun. Appellant was pointing the gun into the street. No one else, particularly Antoine, had a gun. Collins testified that Antoine never touched appellant or Linwood. Collins testified that everyone ran from the apartment complex after the shots were fired.

*Vinson's Testimony*

Quan Javnae Vinson, appellant's cousin, lived with her children in the apartment complex where the fight occurred. On the day of the fight, before Dillard arrived, appellant and Linwood were visiting at her apartment.

Vinson was standing by her front door smoking a cigarette when Dillard and her supporters pulled up.[7] Vinson testified that she was scared because "they brung a lot of dudes with them, you know. And, like, for two females, you shouldn't bring no men to no female fight." Dillard and Linwood began fighting. Appellant ran up to try and break up the fight by pulling Linwood out. Vinson testified that Antoine, who had "been by the truck rolling up a blunt," was saying "Naw, let them fight." Antoine and another man "ran up on" appellant; this seemed aggressive to Vinson. Vinson did not know if either man touched appellant. Vinson stated that Antoine told appellant "If you touch her, I'm going to do this. I'm going to do that to you, and stuff like that. And then by that time, he told … another man to go get his pistol." Appellant then showed her gun. Vinson told appellant to "Calm down, don't shoot."

Vinson's memory of the shooting was that appellant fired once in the air and once at the ground:

> Well, when she shot the first time, when they was up on her, and she had shot in the air. And then that's when everybody started running, because they – it was like, "She got a gun, she got a gun." And then, like, I was already there in front of Tootie. And like … couldn't shoot directly at him, like, she shot at the ground. She hit the ground.

Vinson testified that she saw a total of six or seven guns brought out after appellant had fired and Antoine was shot. The man that Antoine spoke to ran off and came back with a "long gun," but that was after appellant had fired her gun. Vinson stated that unspecified people were

---

[7] Vinson originally told the investigating detective that there were "two cars with females and one truck with dudes in it." At trial, however, she stated that six cars pulled up with about twenty people.

chasing appellant with two long guns and threatened to shoot up Vinson's apartment. Vinson's children were in the apartment, so appellant and Linwood, who Vinson testified had seen the guns, left. A two-door truck followed them out of the complex "to chase them down." Vinson did not know who was driving the truck.

Vinson remembered talking to the investigating detective about how appellant held her gun; she pointed her hand straight out in front of her. Vinson also testified that several videos of the fight were posted on Facebook, but all of those videos had been deleted by the time she tried to show them to the detective.

*Chevis' Testimony*

Chevis testified that after he left Dillard at the Texaco station, he and Antoine went "riding" and "scored us a gram of kush," *i.e.*, marijuana. They ended up at the apartment complex on Bernal after the fight started. Chevis and Antoine exited their vehicle and "came up on" the fight to break it up; other spectators were also moving forward toward the fight to break it up. Everybody was yelling about breaking up the fight; no one was encouraging the fight to continue. It was as they were moving forward that appellant's gun was drawn.

Chevis testified that neither he nor Antoine had a gun or other weapon. Chevis never touched appellant or Linwood.

*Hearne's Testimony*

Nicholas Hearne testified that he was going over to the apartment complex on Bernal to drop something off for Linwood from his ex-fiancé. While Hearne had heard of appellant, he did not know her. When he got to the complex, he saw a crowd of twenty-five to thirty people; he did not know any of those people. There were a lot of cars. Hearne particularly recalled a burgundy truck; an African-American man was "hanging out the truck" with a "long gun." Hearne saw Linwood in the midst of what appeared to be an argument; he did not see the actual fight. Hearne

did see appellant with a gun in her hand, but he could not remember the angle or the elevation. Hearne thought this was a dangerous situation and decided to leave. He heard shots being fired as he drove away from the complex.

*Linwood's Testimony*

Linwood admitted that she did not get along with Dillard and that they had an ongoing dispute. The two women were in a "Facebook fight" prior to the actual fight. Linwood stated that she was angry and ready to fight Dillard when she was posting on Facebook early on the day of the shooting. However, Linwood denied that she was waiting on Dillard to fight until Dillard started calling her "inbox." She and appellant had "moved on" with their day and were visiting with Vinson at Vinson's apartment when Dillard and her supporters arrived at the complex.

According to Linwood, four or five vehicles pulled up in front of the apartments. Ten to fifteen people got out "with force." She saw one gun at that time; a long gun, like a shotgun, hanging out the window of a pick-up truck. This was supposed to be a one-on-one fight; Linwood was expecting only Dillard and maybe one other person.

Linwood stated that Antoine actually tried to entice the fight, saying "if they don't fight, I'm finna basically shoot everything up." Linwood testified that she started fighting Dillard because she did not want to get shot, and because she felt this was a "fight or die" situation.

Linwood testified that appellant regularly carries a gun and keeps it on her person at all times. Appellant was already armed with this gun, which was loaded, at the time the fight started.

Appellant came over to break up the fight, even though people were telling her not to. The crowd began advancing, coming towards the fight; a lot of people were screaming and appeared threatening. While nobody touched appellant, the crowd "ran up on her." Linwood felt threatened. She also felt that appellant was threatened.

Linwood did not see the first shot fired because she was fighting. The second shot occurred when appellant, who was trying to break up the fight, had Linwood by the collar with one hand and the gun in the other: "And when she was pulling me up – she had my shirt right here; and she had the gun in this hand. So as she's pulling me up, when I turned this way, that's how – you know, the gun went off like that." Because the gun was near her forehead, Linwood had a scratch.

After the shots were fired, Linwood and appellant left the complex in a mini-van. They were followed by a burgundy truck. Appellant called her mother, who arranged for a three-way call with the police. A meeting place was arranged and appellant turned herself in to the police.

*Appellant's Testimony*

Appellant testified that in March of 2016 she was living with Linwood in the apartment complex on Bernal. She had purchased a gun for protection and carried it with her.

Appellant agreed that, while Dillard and Linwood used to be friends, they had a falling out and a lot of arguments had occurred via Facebook over a period of months. Appellant admitted that she had been at the club with Linwood the night before the fight but denied that they had harassed Dillard.

On the day of the fight, a lot of Facebook posts had been made; much of it was "trash talk." According to appellant, she and Linwood were calling Dillard's "bluff" which is why they gave Dillard the address of the complex. Appellant did not really expect Dillard to show up for a fight because they had done "plenty of arguments before and nothing never happened."

Appellant and Linwood had spent the day hanging around the complex and had visited her cousin, Vinson, who also lived in the same apartments. They did not hear from Dillard until about 5:00 p.m. They were getting ready to leave Vinson's apartment to go to Walmart when multiple cars and a truck pulled up along the side the street

Everyone jumped out of their cars. Appellant recognized Dillard who had more than six people with her. Appellant was surprised to see Dillard there at all, especially with so many people. Appellant was worried about what was going to happen. These people seemed aggressive and one of them was already recording. Appellant became scared as she thought "something was about to go down."

Appellant and Linwood stepped off Vinson's porch and moved to a grassy area. Appellant felt that there was nowhere for them to go. The people were coming at them and they were yelling and screaming. Appellant wanted to protect Linwood because she knew Dillard "was coming for her."

During the commotion and yelling before the fight, two men approached appellant; they were yelling threatening stuff at appellant and Linwood. Appellant got in front of Linwood. Appellant "felt really ambushed" by the people around her. While the crowd did not completely circle her, appellant felt like Chevis was advancing, coming really close to her.

Dillard came in from the right and she and Linwood started fighting. Appellant not see the fight start immediately because Linwood was behind her. Appellant saw Linwood on the ground with Dillard on top of her.

Appellant testified that she was scared and everything was happening really fast. She did not know what to do.

Appellant tried to break up the fight by grabbing Linwood. A lot of people were yelling at appellant, telling her to stop. She was more scared now because there were too many people surrounding them. Appellant pulled out her gun and shot one time in the air. Some people backed away but some did not; people were still yelling at her.

Appellant got one hand on Linwood, who was still on the ground, trying to lift her up; the other hand was on her gun. Appellant stated that she was trying to get out of there and protect

Linwood. The gun went off a second time while appellant was trying to lift Linwood off the ground.[8]

Appellant testified that she realized Antoine had been shot:

> When the gun went off, I looked down at her (Linwood) and I seen that she was okay. And I raised my head up to look around, and I really didn't see nobody hurt, like, just like hurt. And I seen Hodge. (Antoine) And he … kind of jogged a little bit, and then he collapsed. … As he collapsed, he started crawling.

Appellant claimed that she had not been pointing the gun at anyone. She did not intend to shoot anyone that day and was acting to defend herself and Linwood.

Appellant turned herself into the police. She told the police where to find the gun used in the shooting.

***Forensic Evidence***

The vehicle that appellant was driving as she left the scene of the shooting was searched pursuant to a search warrant. A .32 caliber revolver was found inside a Crown Royal bag. The revolver was loaded with five live rounds. The Crown Royal bag also contained eleven cartridges and a holster. One fired cartridge case was also found in the bag.

The ballistics expert established that appellant's gun was fully functional. At the time of the examination of the gun, it didn't have the cylinder pin; however, that did not mean that the gun could not be fired. It was also impossible to tell when the cylinder pin was removed.[9]

The autopsy conducted on Antoine's body revealed that there was an entrance wound to his chest but no exit wound. A single bullet was recovered from his left femoral artery. Analysis

---

[8] Appellant admitted that, contrary to her trial testimony, she had told the investigating detective that she had shot twice in the air.

[9] The prosecutor argued to the jury, without objection, that appellant and Linwood had reloaded the gun after the shooting and forgot to put the cylinder pin back in.

–11–

of that bullet revealed that it was fired by the revolver found in appellant's vehicle. Appellant does not dispute this evidence.

The medical examiner testified as to the path of the bullet through Antoine's body:

> I could see that it had gone through his third rib on the left side. It went through his heart. It went through his esophagus, which is the tube that connects your mouth to your stomach. It went through his diaphragm, and then the liver, a little bit of the small intestine, and then ended up in his aorta. From the aorta, it traveled down inside the aorta into his femoral artery.

The medical examiner did not believe it was probable that a gun fired in the air could have caused the type of injury that Antoine sustained. In order for the bullet to have entered Antoine's chest, he would have to be facing the direction the gun was pointed. In the medical examiner's opinion, it was not possible that the bullet could have entered from behind. As the medical examiner testified: "The trajectory of the bullet was pretty much straight down – downward. And so if the bullet is arching, I just don't see how it could make that trajectory." The only way that a bullet fired into the air would have caused Antoine's injury was if he had been lying on the ground, not standing up.

## Charge on Criminally Negligent Homicide

In her first issue, appellant claims that the trial court erred by failing to grant her request for a jury instruction on the lesser included offense of criminally negligent homicide. The State does not address the merits of appellant's claim, but instead argues that any error was harmless.

### *Indictment and Instructions*

Appellant was charged in a two count indictment with murder by (1) intentionally and knowingly shooting Antoine with a firearm and (2) committing an act clearly dangerous to human life, with the intent to cause serious bodily injury, by shooting Antoine with a firearm. TEX. PENAL CODE § 19.02(b)(1), (b)(2).

In its charge to the jury, the trial court instructed that an individual commits the offense of murder if she "intentionally or knowingly causes the death of an individual," or "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual." The charge defined "intentionally" and "knowingly" for the jury as follows:

> A person acts intentionally, or with intent, with respect to a result of his conduct when it is his conscious objective or desire to cause the result.

> A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result.

The jury was also instructed that a person commits the lesser included offense of manslaughter if she "recklessly causes the death of an individual." The jury was further instructed that if the jury found that appellant had recklessly caused Antoine's death, it should find her guilty of manslaughter. The charge defined the "reckless" as follows:

> A person acts recklessly, or is reckless, with respect to the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur. The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

The charge also included a self-defense instruction. Appellant did not object to any of these instructions in the jury charge.

### Requested Instruction

Prior to the charge being read to the jury, appellant requested an additional instruction on criminally negligent homicide. Defense Counsel argued in favor of the charge as follows:

> MR. PRICE: Okay. The question the – this whole case involves the defendant's state of mind – Ms. Taylor's state of mind at the time.

> The requirements between intentionally or knowingly, recklessly or negligently – we're just saying that it's a question for the jury to decide.

> And if they believe she acted negligently, they should be able to come back with a verdict of criminally negligent homicide rather than the charge of manslaughter or murder.

–13–

That's our charge, Your Honor.

The State responded as follows: "Without going into the definition, Your Honor, we just don't believe the fact that the defendant was unaware of the circumstances involving the risk. I don't think that was raised by the evidence."

The trial court denied the requested charge, stating as follows: "I don't believe that a charge for criminally neglect homicide is appropriate under the facts that I've heard thus far."

### Jury Charge Error

In analyzing a claim of jury charge error, we must first determine if error exists. *See Almanza v. State*, 686 S.W.2d 157, 173–74 (Tex. Crim. App. 1985); *see also Price v. State*, 457 S.W.3d 437, 440 (Tex. Crim. App. 2015). If it does not, our inquiry ends. *See Price*, 457 S.W.3d at 440. If, however, we find error in the charge, we next consider whether an objection to the charge was made and analyze the error for harm. *Id*. Where, as here, error is properly preserved, by the timely request for an additional instruction, reversal is required only if the error was "calculated to injure the rights of the defendant," which has been defined to mean that there is "some harm" caused to the defendant. *Almanza*, 686 S.W.2d at 171; *see also Barrios v. State*, 283 S.W.3d 348, 350 (Tex. Crim. App. 2009). In evaluating whether appellant suffered some harm in this case, we consider the entire jury charge, the evidence, the arguments of counsel, and any other relevant information in the record. *Olivas v. State*, 202 S.W.3d 137, 144 (Tex. Crim. App. 2006); *Almanza*, 686 S.W.2d at 171.

### Lesser Included Offense

An offense is a lesser included offense if (1) it is established by proof of the same or less than all the facts required to establish the commission of the offense charged; (2) it differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest suffices to establish its commission; (3) it differs from the offense

–14–

charged only in the respect that a less culpable mental state suffices to establish its commission; or (4) it consists of an attempt to commit the offense charged or an otherwise included offense. TEX. CODE CRIM. PROC. art. 37.09.

In determining whether an instruction on a requested lesser included offense should have been given to a jury, we apply a two-pronged test. *Cavazos v. State*, 382 S.W.3d 377, 382 (Tex. Crim. App. 2012) (*citing to and relying* on the *Aguilar/Rousseau* test); *see also Rousseau v. State*, 855 S.W.2d 666, 672 (Tex. Crim. App. 1993); *Aguilar v. State*, 682 S.W.2d 556, 558 (Tex. Crim. App. 1985). First, we must determine whether the lesser offense is included within the proof necessary to establish the greater offense. *Cavazos,* 382 S.W.3d at 382. If it is, we next determine whether some evidence in the record showed that, if the defendant is guilty, he is guilty only of the lesser included offense. *Id.*, at 382, 385; *see also Campbell v. State*, 149 S.W.3d 149, 152 (Tex. Crim. App. 2004).

***Criminally Negligent Homicide***

A person commits an offense of criminally negligent homicide if he causes the death of an individual by criminal negligence. TEX. PENAL CODE § 19.05(a). The definition of criminal negligence is as follows:

> A person acts with criminal negligence, or is criminally negligent, with respect to the circumstances surrounding his conduct or the result of his conduct when he ought to be aware of a substantial and unjustifiable risk that the circumstances exist or the result will occur. The risk must be of such a nature and degree that the failure to perceive it constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint.

TEX. PENAL CODE § 6.03(d). The key to criminal negligence is not the actor's being aware of a substantial risk and disregarding it, but rather the failure of the actor to perceive the risk at all. *Queeman v. State,* 520 S.W.3d 616, 623 (Tex. Crim. App. 2017); *Montgomery v. State*, 369 S.W.3d 188, 193 (Tex. Crim. App. 2012).

Criminally negligent homicide is a lesser included offense of murder. *See Saunders v. State*, 840 S.W.2d 390, 391 (Tex. Crim. App. 1992). Criminally negligent homicide is also a lesser included offense of manslaughter. *Britain v. State*, 412 S.W.3d 518, 520 (Tex. Crim. App. 2013). We conclude that the first prong is met.

### *The Evidence Does Not Support Lesser Included Offense Charge*

We next proceed to the second prong of the test, which is to determine whether some evidence shows that if appellant is guilty, she is guilty *only* of the offense of criminally negligent homicide. This second step is a question of fact and is based on the evidence presented at trial. *Cavazos,* 382 S.W.3d at 383. While anything more than a scintilla of evidence may be sufficient to entitle a defendant to the lesser included offense instruction, the evidence must establish that the lesser included offense is a "valid, rational alternative to the charged offense." *Hall v. State*, 225 S.W.3d 524, 536 (Tex. Crim. App. 2007). It is not enough that the jury may disbelieve crucial evidence pertaining to the greater offense; rather, "there must be some evidence directly germane" to the lesser included offense for the factfinder to consider before an instruction on that lesser included offense is warranted. *Skinner v. State,* 956 S.W.2d 532, 543 (Tex. Crim. App. 1997).

Here, we must determine if there was evidence presented raising an issue of whether appellant was aware of the risk and whether she ought to have, but did not, perceive a substantial and unjustifiable risk in her conduct.

*Evidence Supporting Appellant's Claim*

As noted above, on direct examination, appellant testified that she shot one time in the air as a warning to the crowd, but the second shot was fired accidently as she was trying to lift Linwood off the ground and get her out of the fight. On cross-examination, appellant testified as follows while reviewing the short video of the fight with the prosecutor:

> Q. (BY THE PROSEUCTOR) So the fight … has barely begun, and we see you going to get into this fight that's one-on-one; is that correct?

–16–

A. Correct.

(State's Exhibit No. 5 playing.)

*

Q. (BY THE PROSECUTOR) And we see the victim speak in this frame, don't we, in the grass?

A. Right.

(State's Exhibit No. 5 playing.)

Q. (BY THE PROSECUTOR) And he's backing away, isn't he? He's backing away just as you said in your statement that the men were leaving; is that right?

Let me show it to you again.

(State's Exhibit No. 5 playing.)

Q. (BY THE PROSECUTOR) We just saw his feet backing away, didn't we? And you haven't even fired the first shot, and he's backing away from you, isn't he?

(State's Exhibit No. 5 playing.)

Q. (BY THE PROSECUTOR) So after he's backed away, you fired the gun for the first time, don't you? We just heard that, didn't we, in the video?

A. Yes.

(State's Exhibit No. 5 playing.)

Q. (BY THE PROSECUTOR) And you waited three seconds, and then you pulled that trigger again, didn't you? Is that correct?

A. Well, when I was breaking up the fight, it went off.

Q. When you were breaking up the fight it went off?

A. Yes.

Q. So when you said, "I shot the first time to get everyone back, and then the guys ran to their car. And the second time I shot everybody else," and you said that to … (the detective) … on March 29th of 2016, you … told him something different than what you're saying today; is that right?

A. That's what it says. But, as I remember, I was breaking up the fight.

\*

Q. (BY THE PROSECUTOR) Now … I'm going to show you what's been previously marked as State's Exhibit No. 49. And you say that gun just accidentally went off, just accidentally. And that would mean that Antoine Hodge was the most unlucky person in the world, because it appears that he was shot dead-on in the chest, in the heart; is that right? Is that right?

\*

A. What is your question?

Q. So the gun accidentally went off, but it just happened to hit him straight on in the heart?

A. Yes, ma'am.

\*

Q. And you brought a loaded gun with you; is that right?

A. I had it with me.

Q. A loaded gun you have on you all the time; is that right?

A. Yes.

In addition, Linwood testified that the second shot occurred when appellant, who was trying to break up her fight with Dillard, had Linwood by the collar with one hand and the gun in the other:

We were down on the ground, of course. She was separating us. When they came up, or whatever, we kind of let each other go because it was, like, so much coming towards us or whatever. We didn't really know what to expect. And when she was pulling me up – she had my shirt right here; and she had the gun in this hand. So as she's pulling me up, when I turned this way, that's how – you know, the gun went off like that.

Q. So the gun went off while it was next to your – near your –

A. Right on my forehead.

Q. All right. Were you bleeding at the time?

A. No. I had a scratch.

–18–

Q. Did you feel anything physically when that gun went off?

A. Yes.

Q. What did you feel?

A. The – like the shot. Like, I felt it repel back.

The testimony of both appellant and Linwood essentially raised a defense of accident, a defense no longer specifically recognized in Texas.[10] *Rogers v. State*, 105 S.W.3d 630, 637 (Tex. Crim. App. 2003).

### The "Accident" was not Negligence

A claim of accident does not necessarily entitle a defendant to a charge on criminally negligent homicide. *Thomas v. State*, 699 S.W.2d 845, 850 (Tex. Crim. App.1985) (explaining that the allegation of accidental discharge of a firearm does not necessarily raise the issue of criminally negligent homicide). Nor does a claim that a defendant did not intend the result of his conduct. *Cardenas v. State*, 30 S.W.3d 384, 393 (Tex. Crim. App. 2000) (concluding that a defendant's statement that he did not intend to hit the victim as hard as he did was not evidence that he was guilty only of lesser included offense). Evidence that a defendant knows a gun is loaded, that he is familiar with guns and their potential for injury, and that he points a gun at another person, indicates that the defendant is aware of a risk created by that conduct and disregards the risk; such a defendant is, at least, reckless. *Thomas*, 699 S.W.2d at 850; *but see Levan v. State,* 93 S.W.3d 581, 585 (Tex. App.—Eastland 2002, pet. ref'd) (holding that evidence of accidental discharge

---

[10] Under Texas' current Penal Code there is no "defense of accident." Now, the no-voluntary-conduct aspect of that former defense is addressed by TEX. PENAL CODE § 6.0l(a), which provides that "a person commits an offense only if he voluntarily engages in conduct." *Rogers v. State*, 105 S.W.3d 630, 637 (Tex. Crim. App. 2003). Section 6.02(a) of the Penal Code addresses issues of lack of a required mental state. TEX. PENAL CODE § 6.02(a) (providing that a "person does not commit an offense unless he intentionally, knowingly, recklessly, or with criminal negligence engages in conduct as the definition of the offense requires."). The issue of the voluntariness of a person's conduct or bodily movements is separate from the issue of a person's mental state. *Rogers*, 105 S.W.3d at 638. Appellant does not raise an issue as to the voluntariness of her conduct.

may raise an inference that a defendant did not perceive a risk of injury or death when evidence is also presented that the defendant was not aware that the gun was loaded).

By her own admissions, appellant had a loaded gun in her hand when she jumped into the fight. She admitted that she fired in the air as a "warning shot" to the crowd. The evidence does not establish that appellant failed to perceive the risk of having a loaded gun in her hand when she tried to break up the fight. Appellant's testimony that she shot in the air, deliberately, shows that she either knew the risk, or disregarded the risk, of having a loaded gun. *See Thomas*, 699 S.W.2d at 850; *Trujillo v. State*, 227 S.W.3d 164, 168 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (concluding that where a defendant brandished a loaded gun to frighten off some men with whom he was in an altercation shows that the defendant either perceived or knew the risk of having a loaded gun); *Wong v. State*, 745 S.W.2d 563, 565 (Tex. App.—Waco 1988, no pet.) (concluding that, where the defendant testified that he picked up a knife to defend himself in a fight in the hope that his attacker would not advance does not indicate that the defendant was unaware of the risk created by his conduct). The fact that appellant fired a "warning shot" as a method of intimidating the spectators shows that she was aware that she was, at least, committing an act clearly dangerous to human life.

The record does not show that appellant failed to perceive the risk created by her conduct of brandishing and discharging a loaded gun. Having considered the record, we conclude that there is no evidence showing appellant was guilty only of criminally negligent homicide. We conclude the trial court did not err by denying the requested lesser included offense instruction on criminally negligent homicide.

### Any Error is Harmless

Even if we were to conclude that the trial court erred by not submitting an instruction to the jury on criminally negligent homicide, that error would be harmless.

Here, while appellant was denied an instruction on criminally negligent homicide, she received an instruction on the lesser included offense of manslaughter. Appellant's jury was given the statutory definitions of intentional, knowing, and reckless, and it chose to convict appellant of the "intentional or knowing" homicide offense of murder instead of the "reckless" homicide offense of manslaughter. The jury's choice to convict appellant of murder instead of manslaughter shows that the jury rejected appellant's testimony that the gun "just went off" and believed that she was guilty of the greater offense of murder. *Masterson v. State*, 155 S.W.3d 167, 171–72 (Tex. Crim. App. 2005) (holding that the denial of a jury charge on criminally negligent homicide was harmless because the jury's choice to convict the defendant of murder instead of manslaughter showed that it did not believe the defendant's story that he had accidentally killed the victim). We conclude that any error in failing to instruct the jury on criminally negligent homicide was harmless.

We overrule appellant's first issue.

### Sufficiency of the Evidence

In her second issue, appellant claims that the evidence is insufficient to sustain her conviction for murder because no evidence shows that she possessed the intent to either kill Antoine or to cause him serious bodily injury.[11] The State responds that a reasonable jury could infer from appellant's actions before, during, and after the shooting that she intended to kill Antoine, or knew that his death was a reasonably certain result of her conduct.

***Standard of Review***

A challenge to the sufficiency of the evidence is evaluated under the well-established standards set forth in *Jackson v. Virginia* 443 U.S. 307, 316 (1979); *see also Brooks v. State*, 323

---

[11] Appellant seeks an acquittal from this Court. She does not argue that she should have been convicted of the lesser included offense of manslaughter. Nor does she challenge the sufficiency of the evidence to support the jury's implied rejection of her claim of self-defense.

–21–

S.W.3d 893, 895 (Tex. Crim. App. 2010). We review the evidence in the light most favorable to the verdict and determine whether a rational jury could have found all the elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 894–95. This standard of review for legal sufficiency is the same for both direct and circumstantial evidence. *Wise v. State*, 364 S.W.3d 900, 903 (Tex. Crim. App. 2012); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *Burden v. State*, 55 S.W.3d 608, 613 (Tex. Crim. App. 2001).

We defer to the jury's credibility and weight determinations because the jury is the sole judge of the witnesses' credibility and the weight to be given their testimony. *See Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 898–99; *Haywood v. State*, 344 S.W.3d 454, 458–59 (Tex. App.—Dallas 2011, pet. ref'd). We will uphold the verdict unless a rational factfinder must have had reasonable doubt with respect to any essential element of the offense. *Jackson*, 443 U.S. at 319; *Brooks*, 323 S.W.3d at 899.

When the record supports conflicting inferences, we must presume that the factfinder resolved those conflicts in favor of the prosecution and defer to that determination. *Jackson*, 443 U.S. at 326; *Wise,* 364 S.W.3d at 903. The State need not disprove all reasonable alternative hypotheses that are inconsistent with appellant's guilt. *Wise*, 364 S.W.3d at 903. Rather, we consider only whether the inferences necessary to establish guilt are reasonable based upon the cumulative force of all the evidence when considered in the light most favorable to the verdict. *Hooper*, 214 S.W.3d at 13.

### *Intent May Be Inferred*

By finding appellant guilty of murder the jury, of necessity, found that appellant had acted intentionally or knowingly by shooting Antoine.

Proof of a culpable mental state may be shown through the circumstantial evidence surrounding the crime. *See Hart v. State*, 89 S.W.3d 61, 64 (Tex. Crim. App. 2002). A culpable mental state can be inferred from any facts tending to show their existence, such as actions, words, conduct of the accused, method of committing the crime, and the nature of the wounds inflicted on the complainant. *Id.*

Specific intent to kill may be inferred from the use of a deadly weapon. *Cavazos,* 382 S.W.3d at 384; *Godsey v. State*, 719 S.W.2d 578, 580–81 (Tex. Crim. App. 1986); *see also Hightower v. State*, No. 05-17-00697-CR, 2018 WL 3135147, at *3 (Tex. App.—Dallas June 27, 2018, no pet. h.) (not designated for publication). Knowledge may also be inferred from such evidence. *Hart*, 89 S.W.3d at 64; *Charlton v. State*, 334 S.W.3d 5, 12 (Tex. App.—Dallas 2008, no pet.). When the evidence shows that a deadly weapon was used in a deadly manner, "the inference is almost conclusive" that the defendant intended to kill. *Godsey*, 719 S.W.2d at 581. A firearm is, by statute, a deadly weapon per se. TEX. PENAL CODE § 1.07(a)(17(A).

Here, the indictment specified that appellant shot Antoine with a firearm, a deadly weapon. The jury was properly charged that a firearm is a deadly weapon. It was undisputed that a bullet fired from appellant's gun killed Antoine. As a result, appellant's intent to cause Antoine's death can be inferred.

### The Evidence Supports an Intentional or Knowing Homicide

Even without applying the inference of intent from appellant's use of a firearm, the evidence supports the jury's finding of an intentional or knowing homicide.

*Appellant's Actions before the Shooting*

The evidence showed that Linwood and appellant, acting in concert, planned and promoted the fight on Facebook and provided the exact address of the apartment complex to Dillard. One

of the posts made to Facebook stated: "We're going to be waiting outside for you." Dillard testified that she thought appellant was "hunting" her.

Because of the Facebook posts, appellant knew that there were people who wanted to come and watch the fight. The jury could have disbelieved her testimony that she was surprised to see people other than Dillard show up. The jury could also have disbelieved appellant's testimony that she was uncomfortable, nervous, and scared about being in this situation because she had helped to create the situation.

Appellant's desire to protect Linwood was apparent even before the fight started. After Dillard agreed to the fight, appellant commented on Facebook: "Got to know I'm behind my bitch." Berwick testified that when she arrived at the complex she heard appellant say "Nobody not gonna fuck with my bitch. Nobody not gonna fuck with my bitch."

And it was undisputed that appellant had a loaded gun on her person. This evidence could have suggested to the jury that appellant contemplated using her gun in advance, even though Dillard and Linwood had agreed to mutual combat in what was supposed to be a one-on-one fistfight.

*Appellant's Actions during the Shooting*

The evidence was undisputed that the fight had been underway for only seconds when appellant jumped in, either to break up the fight and/or to protect Linwood.

Appellant testified that she pulled her gun out because there were "too many people surrounding" them. She intentionally fired her first shot in the air as a "warning" to the crowd of spectators. Even if the jury believed that the crowd in general, and Antoine in particular, were threatening because of their proximity, Antoine was backing away before she fired that first shot.

The jury heard Vinson testify that when she first saw appellant exhibit the gun, she told appellant to "Calm down, don't shoot." The jury could reasonably infer from Vinson's testimony

that appellant looked like she was going to shoot someone before she pulled the trigger. Considering this evidence, the jury could reasonably believe that, contrary to the testimony of appellant and Linwood, the gun did not accidentally fire as appellant was focused on pulling Linwood up and out of the fight.

There was also testimony from which the jury could infer that appellant looked like she was going to shoot Antoine in the moments before she pulled the trigger. In the video played for the jury, Antoine appears to be backing away slowly. Antoine is heard on the video to say: "Bitch, do it;" the jury could infer that appellant was threatening to shoot Antoine. The jury could have concluded that appellant intended to shoot Antoine.

Appellant admitted that she first shot in the air. By pulling that trigger, she intentionally, or at least knowingly, committed an act clearly dangerous to human life.

The jury could also have reasonably concluded that appellant intentionally pointed a loaded gun at Antoine and fired it. Berwick testified that she saw appellant point the gun toward the street, which was where Antoine had been standing. Collins also testified that appellant was pointing the gun into the street. Vinson remembered talking to the investigating detective about how appellant held her gun; she pointed her hand straight out in front of her.

There was no evidence that anyone saw Antoine with a gun in his hand. In fact, the only evidence that anyone saw someone other than appellant with a gun prior to the shooting came from Hearne, who testified that he saw an African-American male with a long gun in a truck. Vinson testified that other guns were brought out by the crowd only after appellant fired her gun.

The jury could also have concluded that appellant had the intent to kill from the gunshot wound to Antoine's chest. The medical examiner did not believe it was probable that a gun fired in the air could have caused the type of injury that Antoine sustained. In order for the bullet to have entered Antoine's chest, he would have to be "facing the direction the gun was pointed." The

only way that a bullet fired into the air would have caused Antoine's injury was if he had been lying on the ground, not standing up; there was no evidence that Antoine was lying on the ground before being shot. The jury was allowed to infer that Antoine was standing and facing appellant at the time she shot him.

Given these facts, a rational jury could reasonably believe that the gun did not discharge on its own and that appellant intended to shoot Antoine, either to kill him or to cause him serious bodily injury.

*Appellant's Actions after the Shooting*

Appellant presented evidence that she left the complex because the spectators were retrieving guns after she shot Antoine. Despite that evidence, the jury was entitled to believe that appellant saw no other guns after the shooting. A rational jury could have concluded that appellant's action in driving away from the complex immediately after the shooting constituted evidence that she was attempting to flee the scene of the shooting to avoid prosecution. Flight reflects consciousness of guilt. *Clayton v. State*, 235 S.W.3d 772, 780 (Tex. Crim. App. 2007) (stating that a "factfinder may draw an inference of guilt from the circumstance of flight"); *Bigby v. State*, 892 S.W.2d 864, 883 (Tex. Crim. App. 1994) (same). The jury could have reasonably inferred appellant's guilt for intentionally and knowingly causing Antione's death from her flight.

**Conclusion**

When viewed in the light most favorable to the verdict, we conclude that the evidence is legally sufficient to prove that appellant possessed the intent to kill Antoine or to cause him serious bodily injury. We overrule issue two.

**Evidence of Appellant's Gang Related Tattoos**

In her third issue, appellant claims that the trial court erred by excluding evidence of Antoine's gang tattoos and, by extrapolation, Antoine's alleged gang membership. Appellant

further claims that the rule of optional completeness was violated because the State was permitted to redact evidence from the autopsy report which referred to Antoine's gang tattoos. The State responds that the rule of optional completeness is not applicable because the medical examiner did not present an incomplete picture of the cause of death at the time this report was entered into evidence. The State further responds that appellant never established the relevance of Antoine's gang affiliation and, even if relevant, the prejudicial effect of this evidence outweighed any probative value.

*Background*

Prior to trial, the State sought a motion in limine[12] to exclude photographs of tattoos on Antoine's legs: one tattoo on his right leg read "blood" and another tattoo on his left leg read "gang." These tattoos were noted in the autopsy report. The State argued that the tattoos were not relevant because they had been covered at the time of the shooting and because there was no prior relationship between appellant and Antoine. Defense counsel argued that, even though Antoine was fully clothed at the time of the shooting, the defense intended to call a member of the Dallas Police Department's gang unit to testify as an expert that he believed that Antoine was in a gang based both on the content of these tattoos and on the fact that his brother, Chevis, was in a gang. Defense counsel argued that this evidence was relevant because the defense expert would also testify that this particular gang has a strong propensity for violence, which could help to establish that appellant was justified in defending herself and Linwood at the time of the shooting.

---

[12] While appellant phrases her complaint as one to the trial court's ruling on the State's motion in limine, a motion in limine preserves nothing for review. *Geuder v. State*, 115 S.W.3d 11, 14–15 (Tex. Crim. App. 2003) (holding that a trial judge's grant or denial of a motion in limine is a preliminary ruling only and normally preserves nothing for appellate review). Appellant's actual complaint is that the trial court erred by excluding photographs of Antoine's gang tattoos during trial when appellant sought, repeatedly, to have these photographs admitted into evidence, and obtained definitive rulings from the trial court which continuously excluded this evidence. As such, appellant's arguments have been preserved for our review.

Defense counsel admitted that both Antoine's chest and legs were covered at the time of the shooting, that appellant and Antoine had never met, and that appellant had no knowledge of Antoine's "alleged membership in this gang." The trial court granted the State's motion in limine.

The State informed the trial court that it wished to redact the portion of the autopsy report which noted the tattoos. As the prosecutor said: "I don't intend to use photos of his legs since he was shot in the chest." The State also represented to the court that the police had no "gang card" on appellant and he was not documented as a gang member.

The trial court agreed with the State that the tattoos were not relevant:

> THE COURT: I don't know how that is relevant inasmuch as the decedent was fully clothed and your client had no knowledge that he was a member of the gang. If, in fact, he was a member of the gang …
>
> *
> [U]nless you can show me how that's relevant, I'm going to remain with my initial ruling that we're not going to discuss the decedent, Antoine Hodge, his alleged membership in this gang, because I don't know how that's relevant to the bare-sketch knowledge that I have of what took place.

The trial court stated that it would allow the defense to re-urge its arguments later in the trial, but cautioned defense counsel "you're going to have to demonstrate some relevance. Right now I don't … see it."

The redacted autopsy report, which was admitted into evidence, listed Antoine's identifying marks and scars as follows:

> A 1 x ½ inch irregular scar is on the right forehead. A ½ inch scar is above the right eyebrow. A 1 inch, curvilinear scar is between the eyebrows. Two 1/4 inch scars are on the left knee, and unspecified scars on the right knee. Scattered, faint, irregular scars are on the dorsal left hand.
>
> Black ink designs cover the right and left sides of the face, neck, posterior scalp, chest, abdomen, bilateral upper extremities, and back.

The unredacted autopsy report, which was admitted only for record purposes, contained the exact information, but also added the following: "Other tattoos include "BLOOD" with black ink designs on the right lower leg, and "GANG" on the left lower leg."

At trial, and after the testimony of the medical examiner and the offer of the redacted autopsy report, the defense argued for admission of the unredacted autopsy report under the rule of optional completeness. TEX. R. EVID. 107. The trial court inquired as to what was necessary to understand about the medical examiner testimony, which had identified the cause of Antoine's death and determined that his death was a homicide. The defense noted that there were tattoos on Antoine's face which the defense expert could identify as gang tattoos. The defense indicated that it might want to recall the medical expert at some point if she could be questioned on the tattoos. The trial court stated that it did not think such questioning would be germane, but "if somehow you can make it so, we'll revisit recalling her." The trial court continued to hold that the photographs of Antoine's gang tattoos were not to be mentioned.

After the State rested its case-in-chief, defense counsel again sought to have the trial court change its ruling excluding the photographs of the tattoos. Defense counsel told the trial court that appellant's state of mind was to protect Linwood and herself from "assailants" in the crowd who had been brought by Dillard and were there "acting in a violent nature towards her." Counsel argued that Antoine had "facial tattoos that we have an expert witness that would be able to identify those as gang membership tattoos." It was also the defense's theory that other spectators who were "closing in on" appellant had gang tattoos and were possibly gang members.

The State had no quarrel with the defense's desire to put on evidence of self-defense and/or defense of a third person. However, the State argued that there was no evidence that "anybody was … afraid or knew anything about gang membership or gang members." The State argued that the evidence showed that appellant did not know the spectators.

The defense responded that it wanted to show that Dillard "uses people for a weapon. She doesn't bring a knife or a gun; she brings a … posse. And that posse includes blood gang members; and those blood gang members are prevalent in their tattoos." Defense counsel argued that this heightened the threat level of the crowd surrounding the fight and affected appellant's state of mind. The trial court again denied appellant's request to remove its prohibitions concerning Antoine's alleged gang membership because the defense had failed to demonstrate that it was relevant or germane.

The defense renewed its objection to the exclusion of the reference to Antoine's gang tattoos from the autopsy report under the rule of optional completeness prior to appellant's testimony. The unredacted copy of the autopsy report, including photographs, was admitted for record purposes. The trial court, however, admonished appellant not to discuss Antoine's alleged membership in a gang. Appellant complied with these instructions during her testimony. The trial court gave similar admonishments to Chevis Hodge before his testimony; Chevis made no mention of gang affiliation or gang tattoos.

The trial court established, through questioning counsel, that appellant never made any statements along the lines that she was afraid because she knew the spectators and/or the Hodge brothers were members of the blood gang.

In a bill of review[13] made at the close of the evidence, Dallas Police Officer Barrett (B.K.) Nelson testified that he had been assigned to the gang unit for twenty years. A gang called "Fish Trap Bloods" was a "one of our oldest" traditional "blood gangs" with about 120 members based in west Dallas. Chevis was a member of this gang and the Dallas Police had his name in their gang file.

---

[13] The record identifies the relevant section as "Defendant's Bill of Review," but the parties used the terms "bill of review" and "offer of proof" interchangeably.

Nelson reviewed the unredacted autopsy report. His conclusion was that the tattoos on Antoine's legs – "blood" and "gang" – were indicative that he was a member of a blood gang, though not necessarily the "Fish Trap" Bloods. There was also a tattoo of a five pointed star on Antoine's cheek, which Nelson also associated with a blood gang. Nelson also testified that one of the tattoos across Antoine's chest, "2–1–2," was identified with the "Fish Trap" Bloods. Nelson explained the significance of this tattoo: "in the gang world, 2–1–2 is a ZIP code for West Dallas, 75212, which is specifically … made for Fish Trap Bloods." Based on these tattoos, Nelson testified that he would identify Antoine as a member of the Fish Trap Bloods, a gang that had a reputation for their propensity for violence:

> Fish Trap has been around … a long, long time. They've committed every crime in the Penal Code from narcotics to aggravated robbery to sexual assaults to murder to – you name it. They've been around for a while. They're one of our oldest traditional gangs, so they've done most everything in the book.

### Standard of Review

An appellate court reviews a trial court's admission or exclusion of evidence for an abuse of discretion. *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). A trial court does not abuse its discretion if the decision to exclude evidence is within the zone of reasonable disagreement. *Id.*

### The Rule of Optional Completeness

Rule 107 of the Texas Rules of Evidence provides as follows:

> If a party introduces part of an act, declaration, conversation, writing, or recorded statement, an adverse party may inquire into any other part on the same subject. An adverse party may also introduce any other act, declaration, conversation, writing, or recorded statement that is necessary to explain or allow the trier of fact to fully understand the part offered by the opponent.

TEX. R. EVID. 107. The Rule requires that the omitted portion of the document must be "on the same subject" as the part introduced and "necessary to make it fully understood." *Id.*; *Sauceda v. State*, 129 S.W.3d 116, 123 (Tex. Crim. App. 2004). The rule is designed to reduce the possibility

of the jury receiving a false impression from hearing only a part of some act, conversation, or writing. *Walters v. State*, 247 S.W.3d 204, 218 (Tex. Crim. App. 2007). The Rule is "not invoked by mere reference to a document, statement, or act." *Id*. And the scope of Rule 107 is limited by Rule 403, which permits a trial judge to exclude otherwise relevant evidence if its probative value is substantially outweighed by its unfair prejudicial effect or its likelihood to confuse the issues. *Id*.; TEX. R. EVID. 403.

Here, the omitted reference to the tattoos "blood and "gang" are not necessary to understand the autopsy report or the medical examiner's testimony. The medical examiner testified that appellant died as a result of a gunshot wound to the chest, and that the manner of his death was homicide. Whether Antoine had these tattoos and their meaning, if any, had no bearing on the medical examiner's conclusions.

The medical examiner noted in her testimony that appellant had "many tattoos and a few old scars on his face and knees." The redacted autopsy report also reflected that "black ink designs" covered Antoine's body. The medical examiner did not testify that these were gang related tattoos, but neither did she testify that they were not gang related tattoos.

We conclude that the trial court did not abuse its discretion by determining that Antoine's gang tattoos were not necessary to understand the medical examiner's testimony.

### Relevance

The trial court's reason for initially granting the State's motion in limine was based on its conclusion that appellant had not established that Antoine's gang membership, if any, was relevant. Throughout the trial, the trial judge continued to find that appellant had not demonstrated that the gang tattoos were relevant.

The Texas Rules of Evidence provide that relevant evidence is always admissible unless specifically prohibited. TEX. R. EVID. 402. Evidence is relevant if (a) it has any tendency to make

a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action. TEX. R. EVID. 401.

Appellant argues that Antoine's gang affiliation, as evinced by his tattoos, went to her state of mind at the time of the shooting. However, appellant testified that she did not know Antoine and did not know if he was in a gang. It was undisputed that Antoine's legs were covered at the time of the shooting by his clothing and that the "blood" and "gang" tattoos were not visible. There is no evidence that any of the participants in the fight – Dillard, Linwood, or appellant – were in a gang or that the fight was gang related. We conclude that, regardless of whether the trial court erred by excluding this evidence under Rule 107, the trial court did not err by concluding that the evidence was not relevant.

### *Impact of Rule 403*

As noted above, the rule of optional completeness is limited by Rule 403, which permits a trial court to exclude otherwise relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. TEX. R. EVID. 403. When undertaking a Rule 403 analysis, a trial court must balance (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume  an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).

A murder victim's gang tattoos are considered highly inflammatory character evidence and extremely prejudicial. *See Smith v. State*, 355 S.W.3d 138, 154–55 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (holding the text of decedent's "CRIP LIFE" and "GANGSTAFIED" tattoos was properly redacted from the autopsy report because the defendant presented no evidence he was aware of the tattoos or the affiliation, or that the dispute was gang related); *Wachholtz v. State*, 296 S.W.3d 855, 858 (Tex. App.—Amarillo 2009, pet. ref'd) (holding that the trial court did not err in excluding evidence of the victim's brother's gang tattoos because, although the brother was at crime scene, no evidence existed that the defendant saw anyone with visible gang tattoos or knew about anyone present having gang tattoos).

In this case, the specific text of Antoine's tattoos – "blood" and "gang," – as well as any other evidence of Antoine's gang affiliation, carried a danger of unfair prejudice and confusion of the issues. As noted above, appellant, who did not know Antoine, was not aware of Antoine's gang affiliation, if any, at the time of the shooting. There was no evidence that anyone who had been at the scene of the shooting, other than Chevis, was a gang member. Nor was there even any suggestion from any of the witnesses who testified at trial that this shooting was gang related.

We conclude that the trial court acted within its discretion to exclude this evidence. We overrule appellant's third issue.

## Conclusion

We affirm the trial court's judgment.


/Elizabeth Lang-Miers/

ELIZABETH LANG-MIERS
JUSTICE

DO NOT PUBLISH
Tᴇx. R. Aᴘᴘ. P. 47.2(b)

170658F.U05

–34–



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

SHUNDALE TAYLOR, Appellant

No. 05-17-00658-CR          V.

THE STATE OF TEXAS, Appellee

On Appeal from the 204th Judicial District Court, Dallas County, Texas
Trial Court Cause No. F-16-75497-Q.
Opinion delivered by Justice Lang-Miers.
Justices Evans and Schenck participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered this 1st day of August, 2018.