**Modified and Affirmed and Opinion Filed May 7, 2021**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

## No. 05-19-01051-CR

**MARQUIS DUPREE BAKER, Appellant**
**V.**
**THE STATE OF TEXAS, Appellee**

**On Appeal from the 283rd Judicial District Court**
**Dallas County, Texas**
**Trial Court Cause No. F18-76278-T**

## MEMORANDUM OPINION

Before Justices Myers, Osborne, and Carlyle
Opinion by Justice Myers

A jury convicted appellant Marquis Dupree Baker of murder and assessed his

punishment at twenty-seven years in prison. In two issues, he complains about the

admission of gang affiliation testimony and evidence that law enforcement

discovered appellant's burnt vehicle days after the shooting. Appellant also brings

a third issue asking us correct errors in the judgment. As modified, we affirm.

### DISCUSSION

### I. Gang Affiliation Evidence

In his first issue, appellant contends the trial court reversibly erred by

excluding evidence that the complainant in this case "was a member of the violent

Bloods street gang." The State responds that this claim is not preserved because the argument on appeal does not comport with the arguments made at trial, and, alternatively, that the trial court's ruling excluding the gang affiliation testimony was within the zone of reasonable disagreement because the court could have found the testimony inadmissible under rules 404(b) or 404(a)(3) and 405(a), or that the testimony was unfairly prejudicial under rule 403.

We need not address the State's preservation argument because even if we assume appellant's complaint was preserved, there is no reversible error. Turning, therefore, to the standard of review, a trial court's decision to admit or exclude evidence is reviewed under an abuse of discretion standard. *De la Paz v. State*, 279 S.W.3d 336, 343 (Tex. Crim. App. 2009).

The Texas Court of Criminal Appeals has explained that "[t]he rules of evidence permit the defendant to offer evidence concerning the victim's character for violence or aggression on two separate theories when the defendant is charged with an assaultive offense, as applicant was in this case." *Ex parte Miller*, 330 S.W.3d 610, 618 (Tex. Crim. App. 2009). "First, the defendant may offer reputation or opinion testimony or evidence of specific prior acts of violence by the victim to show the 'reasonableness of defendant's claim of apprehension of danger' from the victim." *Id*. at 619. "This is called 'communicated character' because the defendant is aware of the victim's violent tendencies and perceives a danger posed by the victim, regardless of whether the danger is real or not." *Id*. This theory does not

invoke Rule 404(a)(3)[1] "because Rule 404 bars character evidence only when offered to prove conduct in conformity, *i.e.*, that the victim acted in conformity with his violent character." *Id*. at 619–20. Appellant does not invoke this theory.

"Second, a defendant may offer evidence of the victim's character trait for violence to demonstrate that the victim was, in fact, the first aggressor." *Id*. at 620. Rule 404(a)(3) "is directly applicable to this theory and this use is called 'uncommunicated character' evidence because it does not matter if the defendant was aware of the victim's violent character." *Id.* "The chain of logic is as follows: a witness testifies that the victim made an aggressive move against the defendant; another witness then testifies about the victim's character for violence, but he may do so *only* through reputation and opinion testimony under Rule 405(a)." *Id*. at 620.

Moreover, "[a]n entirely separate rationale supports the admission of evidence of the victim's prior specific acts of violence when offered for a non-character purpose—such as his specific intent, motive for an attack on the defendant, or hostility—in the particular case." *Id*. at 621. "This extraneous offense evidence may be admissible under Rule 404(b)." *Id*. Appellant relies on rule 404(b) and, in a

---

[1] The *Miller* decision referred to rule 404(a)(2), which is now rule 404(a)(3)(A). *See id*. at 617 n.14; *see Barron v. State*, No. 11-18-00324-CR, 2021 WL 747698, at *15 (Tex. App.—Eastland Feb. 26, 2021, no pet.) (noting renumbering of the rule); *see also* Tex. R. App. P. 404(a)(3)(A) (providing that "Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character trait," except "[i]n a criminal case, subject to the limitations of Rule 412, a defendant may offer evidence of a victim's pertinent trait, and if the evidence is admitted, the prosecutor may offer evidence to rebut it.").

footnote, cites the *Miller* court's pronouncement regarding uncommunicated character evidence and rule 405(a).

Yet even when evidence is admissible under rules 404(b) and 405(a), it may be excluded if its probative value is substantially outweighed by a danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence. TEX. R. EVID. 403; *Hernandez v. State*, 390 S.W.3d 310, 323 (Tex. Crim. App. 2012); *Mozon v. State*, 991 S.W.2d 841, 846–47 (Tex. Crim. App. 1999); *see also Harris v. State*, 572 S.W.3d 325, 334 (Tex. App.—Austin 2019, no pet.) ("[E]ven when evidence of an extraneous bad act is admissible under Rules 404 and 405, it may be excluded as unfairly prejudicial under Rule 403."). "The probative force of evidence refers to how strongly it serves to make the existence of a fact of consequence more or less probable." *Gonzalez v. State*, 544 S.W.3d 363, 372 (Tex. Crim. App. 2018).

Relevant evidence is presumed to be more probative than prejudicial. *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997). All evidence against a defendant is, by its nature, designed to be prejudicial. *See Pawlak v. State*, 420 S.W.3d 807, 811 (Tex. Crim. App. 2013). Rule 403 does not exclude all prejudicial evidence; it focuses instead on the danger of unfair prejudice. *State v. Mechler*, 153 S.W.3d 435, 440 (Tex. Crim. App. 2005). Evidence is unfairly prejudicial if it has the capacity to lure the factfinder into declaring guilt on a ground other than proof specific to the offense charged. *Manning v. State*, 114 S.W.3d 922,

928 (Tex. Crim. App. 2003). A trial judge has substantial discretion in balancing probative value and unfair prejudice. *See Powell v. State*, 189 S.W.3d 285, 288 (Tex. Crim. App. 2006).

> When undertaking a rule 403 analysis, a trial court balances:
>
> (1) the inherent probative force of the proffered item of evidence along with (2) the proponent's need for that evidence against (3) any tendency of the evidence to suggest decision on an improper basis, (4) any tendency of the evidence to confuse or distract the jury from the main issues, (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence, and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Gonzalez*, 544 S.W.3d at 372 (quoting *Gigliobianco v. State*, 210 S.W.3d 637, 641– 42 (Tex. Crim. App. 2006)). As the court noted in *Gigliobianco*, however, "these factors may well blend together in practice." *Gigliobianco*, 210 S.W.3d at 642.

Appellant was charged with murder. Evidence showed that on the evening of September 4, 2018, complainant Quentin Dean Nelson and his girlfriend, Alexis Chambers, got into an argument at their apartment. Chambers was upset and left the apartment. She walked to a nearby roadway, sat on the curb, and cried. A white Jeep drove up to her and the driver called out, "[H]ey little mamma, you need a ride?" There was a woman in the passenger seat who asked her if she was okay. Chambers did not know either person. She recalled that she "brushed them off," after which the Jeep drove away. Chambers walked to a nearby convenience store located at the corner of Westmoreland and Gannon, the "Whip In," and asked the

clerk on duty to call her boyfriend, Nelson.

Richard McFann and Nelson were close friends.[2] McFann testified that he received three calls from Nelson that evening looking for a ride. McFann picked him up and they drove to the Whip In, where they saw Chambers walking into the convenience store. Nelson told McFann to go into the store and ask Chambers to come outside to their vehicle and "get her keys and stuff," but when McFann did this Chambers refused, claiming she did not know him. McFann testified that Chambers went "berserk" and started "cussing . . . out" McFann and Nelson.

Chambers eventually left the convenience store and went into the store's parking lot, where she continued arguing with Nelson. Chambers told Nelson a man in white Jeep tried to forcefully pull her into his vehicle and followed her to the store. While Chambers and Nelson argued, McFann looked over and noticed a white Jeep Cherokee parked on the far-right side of the parking lot.

Security camera footage from the Whip In, admitted into evidence at appellant's trial, showed what happened next. The security camera footage revealed Nelson, Chambers, and McFann standing around McFann's vehicle at 10:06:07 p.m., with a white Jeep SUV backed into a nearby parking spot. McFann testified Nelson told him "[t]o go see what was going on." At 10:06:15, McFann approached the white Jeep. He stood by the driver's side door and started talking to appellant,

---

[2] Although they were not related, Nelson referred to McFann as his "Nephew," and McFann called Nelson "Uncle."

the driver, while Nelson and Chambers continued arguing. According to McFann's testimony, he asked appellant in a non-hostile manner "what was going on?" Appellant told him he approached Chambers to see if she needed a ride; he denied trying to pull her into his vehicle. At 10:07:17, Nelson started walking towards the Jeep. He briefly turned around to say something to Chambers, and by 10:07:45 he had joined McFann at the driver's side of the Jeep.

Nelson started to walk away from the Jeep at 10:07:50 p.m. At 10:08:05, Chambers started to walk over to the vehicle, and then Nelson turned around and followed her. At 10:08:25, McFann, Nelson, and Chambers were standing by the driver's side door of the Jeep. Chambers slowly edged away from the others and then, at 10:08:44, started walking back to the front of the store. Nelson also started to walk away from the Jeep at 10:09:07. According to McFann, he saw two pistols on appellant's lap, and he had alerted Nelson.

At 10:09:15, appellant got out of the Jeep. McFann testified he called Nelson back when he saw appellant get out of the Jeep unarmed. At 10:09:37 p.m., McFann and Nelson were talking to appellant, who was standing outside the driver's side door of the Jeep. Chambers was by then standing a few feet away, and she edged closer to them as they talked.

At 10:09:45 p.m. on the security camera video, appellant walked away from the others. He turned around to face them, pulling up his pants. Chambers heard him say, "Do y'all really wanna do this?" Chambers, Nelson, and McFann started

to walk away, and appellant walked back to his Jeep, at which point McFann testified he "thought it was a done deal." Then, at 10:09:52, appellant opened the car door, reached into his vehicle, and retrieved a pistol. McFann heard Nelson say something like "Nephew watch out" or "[W]atch out nephew." As he slowly backed away from appellant, Nelson's hands were extended out to his sides and his palms were open. Appellant fired a shot at 10:09:54, and he chased Nelson out of view at 10:09:59 p.m. McFann testified Nelson was holding his hands up as if to say, "[H]old up man, hold up man." A bus driver passing by on his route, Charles Richardson, testified that he saw Nelson waving his hands in the air before appellant chased him down and shot him.

As appellant chased and shot Nelson, McFann noticed the store clerk was standing outside by the front door holding a pistol. McFann grabbed the pistol from the clerk and shot towards appellant several times. Nelson returned to the front of the store and fell to the ground. Appellant ran back to his vehicle at 10:10:14 p.m. on the security camera video. He paused for a few seconds before getting in the Jeep. He drove away at 10:10:24 p.m.[3] Chambers testified that Nelson returned to the front of the store and collapsed. Both Chambers and McFann went to Nelson's

---

[3] The security camera video in the record is State's exhibit 4, a "zoomed in" version of the video. A non-zoomed-in view of that same security camera footage, State's exhibit 3, was also presented at trial. A letter from the court reporter in our file stated that when preparing the reporter's record in this case she attempted to convert and upload the exhibit but got an error message that it was "bad media," and that the file could not be opened, viewed, or copied. We examined the exhibit and reached a similar conclusion— the file in question could not be opened or viewed. Accordingly, our summary of the security camera footage is based on State's exhibit 4.

aid. Nelson died at the scene while McFann applied pressure to his wounds.

Other testimony showed that five days after the shooting, on September 9, 2018, there was a second encounter between McFann and appellant. According to McFann's testimony, he was out shopping with the mother of his child and his four-month-old infant when he received a telephone call from another store clerk at the Whip In, Christopher Williams, informing him "the [g]uy that killed your uncle" had just stopped by the store. The clerk told McFann that appellant and another man were driving around McFann's apartment complex in a silver Chrysler 300. McFann and the mother of his child drove to their apartment, where McFann went inside and put away the groceries. He got back in the car and they drove out of the complex. The mother of McFann's child was driving; their baby was in the back seat. As they drove out the apartment complex, they saw the silver Chrysler 300. McFann testified that the driver of the Chrysler 300 chased and shot at them for four or five blocks. The clerk testified he heard gunshots as he drove down Gannon. McFann called the police and reported this incident.

Still other testimony presented by the State concerned the discovery on September 9, 2018 of an abandoned vehicle in the 2000 block of Vatican. According to Dallas Police Department detective Christopher Walton, the vehicle was a white Jeep. It had black wheels and fit the description of the vehicle involved in the shooting, as shown in the security camera video. Detective Walton located August 1, 2018 body camera footage from an unrelated offense report involving appellant

that captured the license plate of a white Jeep driven by appellant. This vehicle matched the license plate found on the burnt vehicle. Appellant denied burning the Jeep. He testified that he parked it at the Royal Crest Apartments with the keys left inside, and he did not know what happened to the vehicle after that.

Appellant's complaint on appeal concerns the trial court's refusal to admit testimony from retired Dallas Police detective Mark Markulec, a twenty-year veteran of the department's gang unit who was assigned to the FBI Violent Crime Gang Task Force for twelve years. Markulec testified out of the jury's presence about the significance of certain tattoos on the deceased's body. In particular, Markulec testified that a "MOB4LIFE" tattoo on the deceased's right forearm, and the word "GOON" tattooed on Nelson's chest and the number "5" on the upper central abdomen, all of which are mentioned as identifying marks in the medical examiner's report, indicated an affiliation with the Bloods criminal street gang.

During the hearing before the trial court on admissibility, the State argued this evidence was inadmissible because Nelson wore a muscle shirt during the confrontation and, therefore, appellant could not have seen the tattoos on Nelson's chest and upper abdomen. Moreover, there was no evidence appellant had seen any of Nelson's tattoos or otherwise knew of Nelson's alleged gang membership. The State further argued Nelson's gang membership was inadmissible under rule 403 because it was more prejudicial than probative. The trial court excluded Detective Markulec's testimony because there was no evidence appellant had seen the tattoos

–10–

or knew of Nelson's alleged gang membership.

Appellant argues Detective Markulec's testimony was admissible under rule 404(b) as a prior specific act of violence to show Nelson's "outward aggressive conduct . . . at the time of the killing." But this argument overlooks the fact that Detective Markulec's proffered testimony concerned the identification of Nelson as a Bloods gang member based on Nelson's tattoos, and there is no evidence appellant ever saw those tattoos. In addition, the proffered testimony did not refer to any prior specific act of violence committed by Nelson, and it failed to discuss the Bloods gang's reputation within the community or its propensity for violence.

It should also be noted that appellant's defense at trial was that Nelson's verbal provocations justified the use of deadly force. During his testimony, for example, appellant told the jury he pulled up his pants because he thought he had to defend himself, and appellant claimed Nelson stated that he had a gun in his car and Nelson threatened to shoot him. Appellant also testified that he heard Nelson and McFann mention "Bloods" in their threats, which appellant understood to be a gang reference. Appellant claimed that when Nelson and McFann walked back to their vehicle, he believed Nelson was going to get a gun, and appellant decided to get his gun first. Appellant admitted on cross-examination that the reasonable thing for him to have done when he saw Nelson and McFann walking back to their car would have been to get in his car and drive away. He also admitted that, based on the evidence, he shot Nelson three times and fired his gun eight times.

Verbal provocations alone do not justify the use of deadly force. *See* TEX. PENAL CODE § 9.31(b)(1); *Hamel v. State*, 916 S.W.2d 491, 494 (Tex. Crim. App. 1996). The evidence in the record, including the security camera video capturing the incident, shows appellant was the aggressor—grabbing his gun, firing it into the air, and then pursuing the unarmed Nelson and shooting him to death. There is no evidence appellant and Nelson knew each other prior to the incident; that appellant observed any tattoos on Nelson; or that the shooting was gang related.

Defense counsel argued to the trial court he wanted to introduce the proffered testimony to show "Bloods" referred to a gang, and nothing more. But without any proffered testimony concerning Nelson's or the gang's reputation or propensity for violence, the trial court could have reasonably excluded the testimony because it would not have constituted a prior specific act of violence that would have aided the jury in determining whether Nelson or appellant was the first aggressor. *See* TEX. R. EVID. 404(b); *Allen v. State*, 473 S.W.3d 426, 447 (Tex. App.—Houston [14th Dist.] 2015), *pet. dism'd, improvidently granted*, 517 S.W.3d 111 (Tex. Crim. App. 2017) ("[A]ppellant did not establish that the proffered evidence clarified whether appellant or [the deceased complainant] was the first aggressor, and did so in a manner other than demonstrating [the complainant's] conformity with a violent character only."); *Neal v. State*, No. 12-14-00158-CR, 2016 WL 1446138, at *8 (Tex. App.—Tyler Apr. 13, 2016, no pet.) (mem. op., not designated publication) (evidence of complainant's gang affiliation did not constitute a prior specific act of

–12–

violence).

Turning to rules 404(a)(3) and 405(a), Detective Markulec's proffered testimony does not include any reputation or opinion testimony concerning Nelson's violent character, nor is the detective's identification of Nelson's tattoos—as shown in the autopsy report—reputation or opinion testimony. Accordingly, the trial court also could have concluded the proffered testimony was inadmissible under rule 404(a)(3). *See Allen*, 473 S.W.3d at 445 (testimony appellant knew complainant was member of the Crips was not reputation or opinion testimony); *Alfred v. State*, No. 01-18-00222-CR, 2019 WL 2588102, at *3 (Tex. App.—Houston [1st Dist.] June 25, 2019, no pet.) (mem. op., not designated for publication) (deceased complainant's Facebook posts were not admissible under rule 404(a)(3) as reputation or opinion testimony).

Additionally, the trial court could have concluded the proffered testimony was unfairly prejudicial under rule 403. TEX. R. APP. P. 403. According to Markulec, the "MOB4LIFE," "GOON," and the number "5" tattooed on Nelson indicated a possible gang affiliation. However, there is no evidence the verbal altercation leading up to shooting or the shooting itself was gang related. Indeed, testimony showed the altercation concerned whether appellant tried to forcibly pull Nelson's girlfriend into his vehicle. There is also no evidence, as we noted before, appellant saw any of Nelson's tattoos, and Markulec's testimony would not have explained or clarified whether Nelson or appellant was the first aggressor. A murder victim's

–13–

gang tattoos are considered highly inflammatory character evidence and are extremely prejudicial. *See, e.g., Smith v. State*, 355 S.W.3d 138, 154–55 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (text of deceased complainant's "CRIP LIFE" and "GANGSTAFIED" tattoos properly redacted from autopsy report because defendant presented no evidence he was aware of the tattoos or the complainant's possible gang affiliation affected the defendant's state of mind during the altercation; or that the dispute was gang related); *Wachholtz v. State*, 296 S.W.3d 855, 858 (Tex. App.—Amarillo 2009, pet. struck) (trial court did not err in excluding evidence of complainant's brother's gang tattoos because, although the brother was at crime scene, no evidence existed that the defendant saw anyone with visible gang tattoos or knew about anyone present having gang tattoos); *Taylor v. State*, No. 05-17-00658-CR, 2018 WL 3640467, at *18 (Tex. App.—Dallas Aug. 1, 2018, no pet.) (mem. op., not designated for publication) (trial court did not err by excluding evidence of deceased's tattoos and other evidence of gang affiliation because no evidence existed the parties knew each, that others at the shooting were gang members, or that the shooting was gang related). Therefore, the trial court could have reasonably determined Markulec's proffered testimony was inadmissible under rule 403 because it had little, if any, probative value. We overrule appellant's first issue.

## II. Rule 404(b) Notice

In his second issue, appellant argues the trial court erred by admitting

evidence that the police discovered appellant's burnt vehicle five days after Nelson's death. Appellant argues the trial court abused its discretion because rule 404(b) requires that notice of an extraneous offense be given earlier than the weekend before a trial scheduled to start on Monday.

Trial courts have broad discretion to admit or exclude extraneous offense evidence. *See McDonald v. State*, 179 S.W.3d 571, 576 (Tex. Crim. App. 2005); *Ferrer v. State*, 548 S.W.3d 115, 119 (Tex. App.—Houston [14th Dist. 2018, pet. ref'd). Rule 404(b) provides in part that evidence of crimes, wrongs, or other acts may be admissible provided that "[o]n timely request by a defendant in a criminal case, the prosecutor must provide reasonable notice before trial that the prosecution intends to introduce such evidence—other than that arising in the same transaction—in its case-in-chief." TEX. R. EVID. 404(b)(2).[4]

The purpose of the rule 404(b) notice requirement is to prevent surprise. *Hernandez v. State*, 176 S.W.3d 821, 823 (Tex. Crim. App. 2005); *Hayden v. State*, 66 S.W.3d 269, 272 (Tex. Crim. App. 2001). It "is a rule of evidence admissibility." *Hernandez*, 176 S.W.3d at 824. "The reasonableness of the State's notice generally turns on the facts and circumstances of each case." *Ferrer*, 548 S.W.3d at 120; *see also Rea v. State*, No. 03-11-00186-CR, 2012 WL 3601126, at *2 (Tex. App.—

---

[4] Article 37.07(3)(g) of the Code of Criminal Procedure contains a comparable rule relating to evidence of extraneous conduct introduced during the punishment phase of trial. TEX. CODE CRIM. PROC. art. 37.07(3)(g). The notice requirements of article 37.07(3)(g) and rule 404(b) are similar. *Francis v. State*, 445 S.W.3d 307, 318 n.3 (Tex. App.—Houston [1st Dist.] 2013), *aff'd*, 428 S.W.3d 850 (Tex. Crim. App. 2014).

Austin Aug. 14, 2012, no pet.) (mem. op., not designated for publication) ("Because Rule 404(b) and article 37.07(3)(g) do not define 'reasonable notice,' a court's determination of whether notice is reasonable depends on the facts and circumstances in each individual case."). There is no bright line regarding the number of days or the amount of time that constitutes reasonable notice under rule 404(b). *See Ferrer*, 548 S.W.3d at 120 (quoting *Patton v. State*, 25 S.W.3d 387, 393 (Tex. App.—Austin 2000, pet. ref'd)); *see also Francis v. State*, 445 S.W.3d 307, 319 (Tex. App.—Houston [1st Dist.] 2013), *aff'd*, 428 S.W.3d 850 (Tex. Crim. App. 2014 ("[T]here is no per se rule of unreasonableness" regarding rule 404(b)).

In this case, appellant filed his motion for notice under rule 404(b) on July 18, 2019, over three weeks before the start of trial. The following day, the trial court signed an order granting appellant's motion seeking notice. The State filed two notices of extraneous offenses, the first of which was filed the same day appellant filed his motion; the State's second (first amended) notice was filed on August 2, 2019, ten days before the start of trial. Neither motion referenced the police's discovery of appellant's burnt vehicle. Detective Walton told the trial court he was on vacation between July 22nd and August 8th of 2019. After returning from vacation, he spoke with the prosecutor over the telephone on the evening of Friday, August 9th. The prosecutor told the trial court it was during this meeting that she received notice of the offense report regarding the discovery of the burnt vehicle, and the prosecutor discovered her copy of the case file did not include this

–16–

information.  The prosecutor added that after reviewing the August 1, 2018 body camera footage from the unrelated offense report involving appellant, which showed him in possession of a white Jeep, and the offense report concerning the burnt vehicle, which showed a similar vehicle make and model, she put "two-and-two together" and realized the burnt vehicle was the same vehicle appellant drove during the shooting.  The prosecutor uploaded the report to the portal the following day, on Saturday, August 10, 2019, when she came into work, and defense counsel downloaded the report at 3:25 p.m. that same day.  Jury selection began on Monday, August 12th, and the first testimony was heard the following day.  The evidence at issue was presented to the jury on Thursday, August 15th.

Appellant contends that notice on the weekend prior to trial was unreasonable. In support of this argument, he cites two cases where courts held that notice on the Friday before the start of trial was unreasonable.  *See Neuman v. State*, 951 S.W.2d 538, 540 (Tex. App.—Austin 1997, no pet.); *Hernandez v. State*, 914 S.W.2d 226, 234 (Tex. App.—Waco 1996, no pet.).  Both cases, however, are distinguishable.  In *Hernandez*, for example, the appellant requested notice ten months before trial and the State gave notice three days before trial.  *Hernandez*, 914 S.W.2d at 234.  In *Neuman*, defense counsel was not told the State intended to introduce the evidence until the morning of trial; notice had been requested six weeks earlier.  *See Neuman*, 951 S.W.2d at 539–40.  Also, in both cases the State attempted to rely on an "open-file" discovery policy as sufficient notice—an argument both courts quickly rejected

based on the Court of Criminal Appeals' decision in *Buchanan v. State*, 911 S.W.2d 11, 15 (Tex. Crim. App. 1995) (rejecting argument that defendant's access to prosecution's "open file" containing offense report detailing extraneous offenses constituted reasonable notice). *See Neuman*, 951 S.W.2d at 540; *Hernandez*, 914 S.W.2d at 234.

Some courts have held that notice on the Friday before the start of trial was reasonable under the circumstances of the case. *See Francis*, 445 S.W.3d at 319. In *Francis*, the victim testified at punishment that while the defendant was in custody awaiting trial on the aggravated robbery charge, he threatened her over the telephone. *Id*. at 311. The defense objected to this testimony, arguing the State produced voluminous audio recordings of all the calls the defendant made from jail three days before trial. *Id*. The State replied that it did not produce the recordings until shortly before trial because it had not heard them until then. *Id*. The court held the trial court did not abuse its discretion by finding that notice given at 4:30 p.m. on the Friday before the start of trial on Monday was reasonable. *Id*. at 319. The court stated that "the prosecutor turned the recordings over to defense counsel immediately after she heard them, she specified for defense counsel which phone call she intended to offer evidence of at punishment, and she informed defense counsel that the phone conversation could be found within the first twenty minutes of the recordings." *Id*.

The situation here is closer to *Francis* than it is to either *Neuman* or

*Hernandez.* The extraneous evidence was not discovered by the State until Detective Walton's return from vacation. The defense did not dispute that the late-tendered notice was attributable to the detective's delay, and counsel did not argue the evidence was deliberately withheld: "[The State] keeps saying, well, it's all on him. That's fine. Detective Walton made his best efforts. I mean, I'm not—I'm not saying this was anything intentionally withheld." The record shows that notice was provided to the defense when the State put "two-and-two together." We conclude the notice provided here was reasonable under the circumstances.

Additionally, even if we assume the trial court erred, the error was harmless because it did not affect appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b); *Hernandez*, 176 S.W.3d at 822–25 (rule 44.2(b) harm analysis applies to a violation of rule 404(b) notice provision). The purpose of the rule 404(b) notice requirement, as we noted before, is to prevent surprise. *See, e.g., Hayden*, 66 S.W.3d at 272. At trial, defense counsel argued that if he had had more time, he "might have changed his defense strategy somewhat" and "brought a witness or two up." But if there had been legitimate surprise requiring a re-evaluation of trial strategy, appellant could have requested a continuance, which he did not do. *See, e.g., McDonald*, 179 S.W.3d at 578 (defendant's failure to request a continuance was a factor weighing against finding of harm when State failed to give timely rule 404(b) notice); *Francis*, 445 S.W.3d at 319 (citing *McDonald* and other authorities).

Furthermore, the record shows the conviction is supported by ample evidence.

*See, e.g., Motilla v. State*, 78 S.W.3d 352, 358 (Tex. Crim. App. 2002) (evidence of the defendant's guilt is a factor to be considered in any harm analysis). Appellant testified in his own defense and admitted he shot and killed an unarmed Nelson; the issue was whether appellant was justified in his actions on the night of the shooting. The jury was able to review the security camera footage that showed the incident. It heard testimony from eyewitnesses to the shooting. The jury heard about a second shooting involving McFann that occurred days after Nelson was murdered. Moreover, the jury heard about appellant's criminal history, which included, according to his testimony, prior convictions for robbery, burglary of a habitation, two counts of assault, and two counts of armed criminal action. Appellant admitted he was an "[o]n and off" "dope" dealer. He also admitted it would have been reasonable for him to get in his car and drive away when he saw Nelson and McFann walking back to their car. And during its closing argument, the State made only the following reference to the burnt vehicle:

> Let's talk about Chris Williams. He recognized the defendant. Guess what? He's always up there in that white Jeep. Days after the murder, he's now in a Chrysler 300, which he admits he owns. He has the white Jeep, the BMW, the Chrysler 300. He's up at the store.
>
> Guess what? Shots fired later at Eagle Pointe apartment where Richard McFann lives and this defendant admitted that he lived before and where he goes to deal dope. Okay. We also find out the white Jeep is later found burned.
>
> That's consciousness of guilt. You're getting rid of evidence, you're getting rid of witnesses or attempted to. Who knows what went on down there or out there rather.

–20–

We conclude, therefore, that any error by the trial court in admitting the burned-Jeep evidence did not influence the jury or had but slight effect. We overrule appellant's second issue.

### III. Modification of Judgment

Appellant brings a third issue asking us to modify the judgment to accurately reflect the attorneys for the State and appellant's plea of not guilty. The State does not oppose this request.

First, the record shows Assistant District Attorneys Amber Moore, State Bar of Texas (SBOT) number 24097904, and Michelle Shughart, SBOT number 24044559, represented the State. However, the judgment lists "Marshel Bowman 24092159" as the attorney for the State. Second, the record shows appellant entered a plea of not guilty to the offense, but the judgment in this case incorrectly states appellant pleaded guilty to the charged offense.

Because we have the authority and the necessary information in the record to do so, we modify this judgment in this case to reflect that the "Attorney for State" was "Amber Moore 24097904" and "Michelle Shughart 24044559," and that appellant's "Plea to Offense" was "Not Guilty." *See* TEX. R. APP. P. 43.2(b); *Bigley v. State*, 865 S.W.2d 26, 27–28 (Tex. Crim. App. 1993); *Asberry v. State*, 813 S.W.2d 526, 529–30 (Tex. App.—Dallas 1991, pet. ref'd).

As modified, we affirm the trial court's judgment.

/Lana Myers//
_____
LANA MYERS
JUSTICE

191051f.u05

Do Not Publish
TEX. R. APP. P. 47.2(b)



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

MARQUIS DUPREE BAKER,
Appellant

No. 05-19-01051-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 283rd Judicial
District Court, Dallas County, Texas
Trial Court Cause No. F18-76278-T.
Opinion delivered by Justice Myers.
Justices Osborne and Carlyle
participating.

Based on the Court's opinion of this date, the judgment of the trial court is **MODIFIED** as follows:

The portion of the judgment entitled "Attorney for State" is changed from "Marshel Bowman 24092159" to "Amber Moore 24097904" and "Michelle Shughart 24044559."

The portion of the judgment entitled "Plea to Offense" is changed from "Guilty" to "Not Guilty."

As **REFORMED**, the judgment is **AFFIRMED**.

Judgment entered this 7th day of May, 2021.